Jaime A. Bartlett (SBN 251825)
jbartlett@sidley.com
SIDLEY AUSTIN LLP
555 California St., Suite 2000
San Francisco, CA 94104
Telephone: 415.772.1200

Thomas K. Cauley, Jr. (*pro hac vice* pending)
tcauley@sidley.com
Charles K. Schafer
cschafer@sidley.com (*pro hac vice* pending)
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
Telephone: 312.853.7000

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ORACLE PARTNERS, L.P.; ORACLE INSTITUTIONAL PARTNERS, L.P.; ORACLE TEN FUND, L.P.; FEINBERG FAMILY TRUST; VENROCK HEALTHCARE CAPITAL PARTNERS III, L.P.; VHCP CO-INVESTMENT HOLDINGS III, LLC; COWEN HEALTHCARE INVESTMENTS II LP; CHI EF II LP; KERN ODYSSEUS, LLC; PNC GIFT TRUST OF 2012; SCHULER CONCENTRIC PARTNERSHIP,<br><br>                                          Plaintiffs,<br><br>        v.<br><br>CONCENTRIC ANALGESICS, INC., FRANK J. BELLIZZI, JR., AND JOHN DONOVAN,<br><br>                                          Defendants. | Case No. _____<br><br>Hon. _____<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED** |

Oracle Partners, L.P.; Oracle Institutional Partners, L.P.; Oracle Ten Fund, L.P.; Feinberg Family Trust; Venrock Healthcare Capital Partners III, L.P.; VHCP Co-Investment Holdings III, LLC; Cowen Healthcare Investments II LP; CHI EF II LP; Kern Odysseus, LLC; PNC Gift Trust of 2012; and Schuler Concentric Partnership (collectively, "Plaintiffs"), by and through their undersigned counsel, allege and state their complaint against Frank J. Bellizzi, John Donovan, (collectively, the "Individual Defendants") and Concentric Analgesics, Inc. ("Concentric," and collectively with Individual Defendants, "Defendants") as follows:

## NATURE OF THE ACTION

1.      Plaintiffs have wrongfully suffered tens of millions of dollars in damages at the hands of Defendants.  Plaintiffs are the largest investors in Concentric's Series B round of financing, which closed on May 13, 2019, collectively investing more than $48 million.[1]  Each of the Plaintiffs invested in Concentric in reliance on false and misleading information presented by Defendants regarding clinical trials for Concentric's primary analgesic (pain relieving drug), CA-008.

2.      As detailed below, Defendants falsely represented to Plaintiffs that a critical trial of CA-008 showed it was highly effective in relieving pain associated with total knee replacement surgeries, a surgical model that Defendants told Plaintiffs was the most economically important surgical model for evaluating the market for CA-008.  Defendants also falsely told Plaintiffs that the knee replacement surgery trial of CA-008 demonstrated a decreased reliance by patients on opioid drugs.  Defendants assured Plaintiffs that both of those successes were highly statistically significant.  In reality, the knee replacement surgical trial ███████████████████████████.  Defendants' false and misleading representations caused Plaintiffs to make significant investments in Concentric that they would not have made given the valuation of the Company at that time had they known the true results of that trial.

3.      Defendants knowingly represented these facts to Plaintiffs knowing full well that they were untrue. ████████████████████████████████████████

████████████████████████████████████████

---

[1] A true and correct copy of the May 13, 2019 Stock Purchase Agreement ("SPA") is attached to the Complaint as Exhibit A, with Exhibit A thereto filed under seal as revealing the names and investments of all Series B investors in Concentric.

██████████████████████████████████████████████████████ Shortly thereafter, Defendants told investors the exact opposite, and continued telling investors the exact opposite for five months until they secured Plaintiffs investments in Concentric in May 2019.

4.    Critically, both before and after falsely representing to Plaintiffs that the knee replacement trial demonstrated CA-008's efficacy to a high degree of statistical significance, Concentric admitted to the FDA in February 2019 that the results of the trial showed no statistical significance regarding the primary efficacy metric and a key secondary metric.

5.    One month *after* Defendants secured Plaintiffs' investment in the Company, Defendants admitted for the first time that the knee replacement trial results it presented to Plaintiffs were false. But it continued deceiving Plaintiffs for months afterward regarding the reasons why it presented them with erroneous data. Defendants continue to maintain that their misrepresentations were an innocent mistake, not fraud. But this contention is belied by the facts. And even if the facts were different, and Defendants had unintentionally misrepresented these critical facts to Plaintiffs, Plaintiffs still would be entitled to rescission of their purchases of Concentric's Series B shares.

## JURISDICTION AND VENUE

6.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 27 of the Securities Exchange Act of 1934 (the "1934 Act") because the Complaint states a federal question regarding whether Defendant violated Section 10(b) of the 1934 Act, 15 U.S.C. §§ 78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5. Federal courts "shall have exclusive jurisdiction" over "violations of the [the 1934 Act] or the rules and regulations thereunder" pursuant to § 27 of the 1934 Act.

7.    This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

8.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 because the Defendant is domiciled in San Francisco, a substantial portion of the transactions and wrongs complained of herein occurred, or were directed from, within this District, and the Defendant has received substantial compensation in this District by engaging in those same transactions and wrongs. Furthermore, pursuant

to the Stock Purchase Agreement governing Concentric's sale of the Series B shares to Plaintiffs, the Parties have agreed that venue is proper in this District "in the event of exclusive federal jurisdiction," which applies here because Plaintiff brings claims under Section 10(b) and Rule 10b-5 .

## PARTIES

9.     Plaintiffs Oracle Partners, L.P., Oracle Institutional Partners, L.P., and Oracle Ten Fund, L.P. (collectively, "Oracle") are Delaware limited partnerships with their principal places of business at 262 Harbor Drive, 3rd Floor, Stamford, Connecticut 06902.  On May 13, 2019, Oracle purchased ████ Series B shares in Concentric for an aggregate purchase price ████████

10.     Plaintiff Feinberg Family Trust is an irrevocable trust organized under the laws of Connecticut with its principal place of business at 767 Third Ave, 11th Fl., New York, New York 10017. On May 13, 2019, Feinberg Family Trust purchased ████ Series B shares in Concentric for an aggregate purchase price of ████

11.     Plaintiffs Venrock Healthcare Capital Partners III, L.P. and VHCP Co-Investment Holdings III, LLC (collectively, "Venrock") are Delaware limited partnerships and limited liability companies respectively, with their principal places of business at 3340 Hillview Avenue, Palo Alto, California 94304.  On May 13, 2019, Venrock purchased ████ Series B shares in Concentric for an aggregate purchase price of ████

12.     Plaintiffs Cowen Healthcare Investments II LP and CHI EF II LP (collectively, "Cowen") are Delaware limited partnerships with their principal places of business at 599 Lexington Avenue, 19th Floor, New York, New York 10022.  On May 13, 2019, Cowen purchased ████ Series B shares in Concentric for an aggregate purchase price of ████

13.     Plaintiff Kern Odysseus, LLC ("Kern Odysseus") is a Delaware limited liability company with its principal place of business at 60 East Sir Francis Drake, Suite 302, Larkspur, California 94939. On May 13, 2019, Kern purchased ████ Series B shares in Concentric for an aggregate purchase price of ████

14.     Plaintiff PNC Gift Trust of 2012 ("PNC Trust") is a gift trust organized under the laws of Colorado with its principal place of business in Avon, Colorado.  On May 13, 2019, PNC Trust purchased ████ Series B shares in Concentric for an aggregate purchase price of ████

15.     Plaintiff Schuler Concentric Partnership is an Illinois partnership with its principal place of business at 100 N. Field Drive, Suite 360, Lake Forest, Illinois 60045.  On May 13, 2019, Schuler Concentric Partnership purchased ███ Series B shares in Concentric for an aggregate purchase price of ██████

16.     Upon information and belief, Defendant Concentric is a Delaware corporation, based in San Francisco, California.  Concentric describes itself as a private, biotechnology company, having a focus on discovering and developing novel, non-opioid therapeutics for the management of acute and chronic pain.

17.     Upon information and belief, Defendant Frank J. Bellizzi, M.D., resides in San Francisco, California, and at all relevant times concerning the events alleged herein served as the Chief Executive Officer of Concentric.

18.     Upon information and belief, Defendant John Donovan, M.D., resides in San Francisco, California, and at all relevant times concerning the events alleged herein served as President and Chief Scientific Officer of Concentric.

## FACTUAL ALLEGATIONS

### A.     Company Background

19.     According to its website, Concentric was founded in 2014, in San Francisco, California, and is developing "a portfolio of non-opioid therapeutics that provide long-lasting pain relief after a single local administration."

20.     Concentric is developing pain-relieving products, primarily for post-surgical uses, that are injected at the surgical site to provide long-lasting pain relief.  Concentric has told potential investors and the public that it expects its products to result in "meaningfully decreasing the use of opioids, as well as indirectly decreasing their misuse and abuse."

21.     Concentric's flagship pain product—and the one at issue in this dispute—is known as "CA-008."

22.     Concentric's management team includes its Founder & President, Dr. John Donovan, and its CEO, Dr. Frank Bellizzi.

23.     Upon information and belief, before founding Concentric, Dr. Donovan worked for a

1  company that was working on developing a drug similar to CA-008.

2      24.    Upon information and belief, Dr. Bellizzi is a dentist by training who was brought in by

3  Dr. Donovan—a friend from college—to help lead Concentric, and Dr. Bellizzi does not have any prior

4  experience developing analgesics.

5  **B.    Company Representations Regarding the Market for CA-008**

6      25.    During presentations to prospective investors, including Plaintiffs, Concentric identified

7  several "optimal" surgical models to demonstrate the efficacy of CA-008.

8      26.    One such model was for bunionectomies, which are surgeries to remove bunions from toes.

9  Bunionectomies are a classic type of surgery on which to run initial tests of analgesics.  As Concentric

10  admitted to potential investors, however, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

11  This means that the market for pain medications for bunionectomies alone is virtually nonexistent because

12  no company could profitably develop a drug effective only for this type of surgery.

13      27.    On the other end the spectrum, Concentric identified total knee arthroplasty ("TKA")

14  surgeries (i.e., total knee replacements) as ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮—given

15  the prevalence of the surgery and the pain associated with its recovery.

16      28.    The third surgical model identified by Concentric as optimal for demonstrating the efficacy

17  of CA-008 was abdominoplasty surgeries—a cosmetic procedure that involves removal of excess skin and

18  fat from a patient's abdomen—which Concentric characterized as ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19  ▮▮▮▮▮

20      29.    Concentric ran clinical trials of CA-008 across these three surgical models. Its reporting

21  (and misreporting) of the results from those trials is described below.

22  **C.    Concentric Knowledge and Representations Regarding Clinical Trial Results**

23      **1.    Bunionectomy Results**

24      30.    Concentric began its testing of CA-008 by running two phases of clinical trials on

25  bunionectomy surgeries.

26      31.    Phase I, which included a test population of 40 bunionectomy patients, measured the

27  overall safety of CA-008, and found the product to be safe and well-tolerated.

28      32.    Phase II studied the efficacy of CA-008 on 147 bunionectomy patients, comparing three

doses of CA-008 against a placebo.  For the Phase II trial, Concentric defined the "Primary endpoint" (i.e., the most important outcome Concentric was studying in the trial) as "pain area under the curve (AUC) 0-96 hours."

33.     Pain Area Under the Curve ("AUC") is a calculation used to quantify the magnitude and duration of pain during a specified period (here, 0 to 96 hours after surgery) in a single continuous measure based on Numerical Rating Scale ("NRS") scores recorded during this period. NRS scores are simply a reflection of a patient's self-reporting of his or her pain on a scale from 0 to 10.  This calculation is an important data point in evaluating efficacy, because it shows the patient's pain over the entire time period, which can be easily compared among patients.

34.     Concentric defined the "key secondary endpoints" as "AUC 0-168 hours (one week)," "Opioid consumption 0-96 hours," and "Percent opioid free 0-96 hours."

35.     Concentric informed investors that it "achieved primary and all secondary endpoints for highest dose" during Phase II. This means that, in connection with the bunionectomy trials, CA-008 had demonstrated a reduction in pain compared with a placebo over a four-day period, and a one-week period; had demonstrated a reduced consumption of opioids over a four day period; and had increased the number of patients who had stopped taking opioids at the end of a four-day period.

36.     Concentric also informed potential investors that there was "clear evidence of dose response" – meaning the higher the dose, the more effective the drug.

37.     Concentric further noted milestone reductions in pain at each 24-hour period measured after surgery through hour 120.

38.     In other words, the drug showed promise for bunionectomies, albeit in a surgical model with a virtually non-existent commercial market.  But these results justified moving to trials of CA-008 in other surgical models that, if successful, could have a much larger commercial market.

**2.    Abdominoplasty Results**

39.     In the fall of 2018, Concentric ran a Phase II trial on abdominoplasty surgeries.  Upon information and belief, Concentric did not run a Phase I trial on abdominoplasties or TKA surgeries, and thus moved directly to Phase II trials for both surgical models.

40.     The first cohort (i.e., group of patients studied together as part of a clinical trial) of the

1  Phase II abdominoplasty trial compared the 5 mg dose of CA-008 against a placebo. Concentric informed

2  potential investors that, while the ████████████████████████████████████████

3  ██████████████████████████████████████████████████████████████████████████████

4  ████████████████████

5      41. ████████████████████████████████████████████████████

6  ██████████████████████████████████████████████████████████████████████████████

7  ████████████████████████████████████████████████

8      **3.    TKA Results**

9      42.    At approximately the same time that it was running the Phase II abdominoplasty trial,

10  Concentric ran the first cohort of Phase II of the TKA trial ("Cohort 1 of the Phase II TKA Trial"),

11  comparing the 5 mg dose of CA-008 against a placebo.

12      43.    Cohort 1 of the Phase II TKA Trial was the most important trial Concentric had, or has,

13  run. The results of that trial were critical to Concentric's ability to attract investors.

14      44.    CA-008 had shown early promise in bunionectomies, a surgical model with little to no

15  market, ████████████████████████████████████████ which represented a medium

16  sized market for the product. As Concentric told investors, TKA surgeries ████████████

17  ████████████████████ CA-008.

18      45.    Had Concentric presented negative results from the TKA trial—███████████

19  ████████████████████—it would have been extremely difficult for Concentric to raise money from potential

20  investors. And, importantly, the market value of Concentric's shares would have plummeted given CA-

21  008's greatly reduced prospects for success. This backdrop sheds light on Concentric's motivations, and

22  helps explain its misrepresentations to potential (and later, actual) investors regarding the results of this

23  trial.

24      **a.    Initial Data from TKA Trial**

25      46.    Cohort 1 of the Phase II TKA Trial was conducted in late-November and early-December

26  2018, by Lotus, the Clinical Research Organization ("CRO") Concentric hired to run its trials.

27      47.    On December 22, 2018, Lotus sent a link to the "interim data snapshot" ("Interim Data")

28  from Cohort 1 of the Phase II TKA Trial by email to Carole Hodge, Concentric's Clinical Operations

1   Director, copying Concentric's President, Dr. Donovan, and its Chief Medical Officer ("CMO"), Dr.

2   Michael Royal.  In addition to providing the Interim Data, Lotus informed Concentric that it would provide

3   its interim analysis of that data ("Interim Analysis") by the end of the year (i.e., within approximately one

4   week).

5          48.    Dr. Steve Shafer, Concentric's biostatistician, immediately set about analyzing the Interim

6   Data.  Within one week, Dr. Shafer concluded that, ███████████████████████████████████

7   ████████████████████████████████████████████  On December 28, 2018, he wrote to the

8   Individual Defendants and Royal: ████████████████████████████████████████████

9   ███████████████████████████████████

10         49.    In other words, the results ██████████████████████████████████████████

11  ████████████████████████████████████████████████████████████████████████████

12  ██████████████████████

13         50.    Dr. Shafer's reference to "imputation" refers to filling in (or "imputing") missing data

14  when subjects drop out of a study early for any number of reasons.

15         51.    After informing the Individual Defendants and Royal that the Interim Data showed that the

16  tests ████████████████████████████████████████  Dr. Shafer then wrote that he used

17  two different methods to impute the missing data ████████████████████████

18         52.    Dr. Royal, responded to Dr. Shafer that same day: ███████████████████████

19  ████████████████████████████████████████████████████

20         53.    On information and belief, Cohort 1 of the Phase II TKA Trial originally was proposed to

21  have ████████████████████████████████████████████████████████████████████

22  ██████████████████████████████████████  This decreased sample size made it exceedingly

23  difficult to achieve statistically significant results, because having more patients yields more information

24  and thus reduces uncertainty that results were achieved by chance.

25         54.    Dr. Shafer replied on December 30, 2018, ████████████████████████████████

26  ████████████████████████████████  Dr. Shafer then included a discussion, ████

27  ████████████████████████████████████████████████████████████████████████████

28  ████████████████████████████████████████████████████████████████████████████

55. The first caveat was that ███████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████

56. Dr. Shafer's second caveat related to presenting data that ██████████
█████████████████████████████████████████████████

█████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
████████████████████████████████████████

57. In other words, Dr. Shafer acknowledged that ██████████████████
████████████████████████████████████████████████████████████
███████████

58. Dr. Shafer's reference to a "NONMEM" analysis refers to what he calls a "mixed-effect" analysis,[2] and is also the name of a program used to perform nonlinear mixed effects modeling—a statistical technique that Dr. Shafer favored. ███████████████████████████████
█████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
████████████

59. ██████████████████████████████████████████████████████████

_____

[2] A mixed-effects model is a statistical model that incorporates both fixed effects (parameters assumed to be the same each time data is collected) and random effects (variables associated with each sample or individual from a population).

60.     As discussed in more detail below, Concentric avoided this problem altogether by opting for a third strategy: ███████████████████████ by both misrepresenting and obscuring ███████

**b.     Interim Data Analysis from TKA Trial**

61.     On December 31, 2018, as it had promised, Lotus delivered to Donovan, Royal (Concentric's CMO) and Hodge (its Clinical Operations Director) a link to its Interim Analysis of the Interim Data from Cohort 1 of the Phase II TKA Trial.

62.     The Interim Analysis unambiguously showed that the primary endpoint, measuring average pain scores at the 96 hour mark, ███████████████████████ ██████

63.     In order to be considered a statistically significant result, statisticians look for a probability value, or "p-value," that is less than the significance level, which is normally set at 0.05.[3] This means that the chance of the observed result occurring through random chance is less than 5%. For comparison, a p-value of 0.50 means that the chance of a given result occurring by chance is 50%–i.e., equivalent to a coin-flip.

64.     In the December 31, 2018 Interim Analysis file, Lotus told Concentric that ███████ ██████████████████████████████████████ ██████████████████████████████████

**c.     Defendants' Representations and Misrepresentations of TKA Trial Data to Plaintiffs Prior to Their Investments**

65.     As outlined below, the timeline of Concentric's representations regarding Cohort 1 of the Phase II TKA Trial over the first half of 2019, both to Plaintiffs and to the FDA, as well as in the very

---

[3] *See,* e.g., *S.E.C. v. Selden*, 632 F. Supp. 2d 91, 94 (D. Mass. 2009) ("A p value of 0.05 or less (indicating a 95% level of certainty that the observed effect was not randomly induced) is generally accepted as showing a statistically-significant effect.").

limited internal communications obtained by Plaintiffs to date, plainly show Concentric's fraudulent and deceptive conduct. Meanwhile, throughout this period, representatives from Plaintiffs held numerous phone calls and meetings with Concentric and its executives, including the Individual Defendants, who ███████████████████████████████████████████████████████████████████████

66.    **January 2, 2019**: Two days after Lotus delivered Concentric its Interim Analysis showing the lack of statistical significance in the TKA trial results regarding average pain score at 96 hours, Concentric's President, Dr. Donovan, wrote its CMO, Dr. Royal, and asked for assistance "putting [together] a couple of slides to help Richard to entice" a potential investor, by showing him ████████ ████████████████████████████████████

67.    In other words, less than two weeks after receiving the Interim Data, and just days after receiving the Interim Analysis—██████████████████████████████████████████████ ██████████—Concentric executives including Defendant Donovan were searching for ways to present the data in such a manner as to show CA-008 ████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████

68.    **January 17, 2019**: Concentric put together a presentation for potential investors, including Plaintiffs, entitled "CA-008: TKA SAD Cohort #1; Preliminary Results." With respect to ████████ Concentric represented that:

69.    The "P=" numbers here were the *purported* p-values represented by Defendants to be associated with these results—i.e., their statistical significance. Concentric was reporting that, when missing data was imputed, there was *only a* ████ probability that the successful achievement of the primary endpoint—milestone reduction in pain at 96 hours—occurred merely by chance; and only a ████ probability of those results occurring by chance when missing data was not imputed. It also reported a

1    ██████ probability of the nearly ████ reduction in opioid use occurring by chance.

2        70.    Simply put, Concentric represented to Plaintiffs that Cohort 1 of the Phase II TKA Trial

3    ███████████████████████████ It represented that the results of this trial were ██████████████████

4    ██████████████ It represented that Concentric had ████████████████████████

5    ████████████████████████████████████████ And it

6    represented that ████████████████████████████████ All of these

7    representations were false.

8        71.    While Concentric also presented ██████████ to investors in the same January 17

9    presentation deck, it (a) did so in a separate slide, directly following the slide stating that █████████

10   ████████████████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████████████████

15   ██████████ Even then, the data it presented regarding the ██████████, and the █████████████

16   ████, were falsely inflated.

17       72.    **February 15, 2019**: Concentric presented a 107-page "Clinical Overview" to the FDA

18   regarding CA-008.  With respect to Cohort 1 of the Phase II TKA Trial, Concentric represented to the

19   FDA (emphasis added):

20   ████████████████████████████████████████████████████████████████
21   ████████████████████████████████████████████████████████████████
22   ████████████████████████████████████████████████████████████████
23   ████████████████████████████████████████████████████████████████
24   ████████████████████████████████████████████████████████████████
25   ████████████████████████████████████████████████████████████████

25       73.    Unlike the ██████████ Concentric presented to the FDA from Cohort 1 of the Phase

26   II TKA Trial, Concentric referenced only ██████████████ in the summary slide of its presentations to

27   investors:

28   ████████████████████████████████████████████████████████████

74. After presenting to potential investors, including Plaintiffs Kern and Venrock, in its January presentation that Concentric had ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████

75. Concentric's representation to the FDA that ███████████████████████████—while consistent with what it told Plaintiffs through the time of their investments in the company—████████████████████████ Moreover, even after Concentric was forced to admit its other misrepresentations to Plaintiffs in June 2019 (as addressed below), it falsely represented to Plaintiffs that all of its representations to the FDA had been accurate.

76. **March 2019**: Contrary to its earlier representations to the FDA in February 2019, Concentric continued to tell Plaintiffs ████████████████████████████████████████

77. In a presentation to Plaintiffs and other investors dated "March 2019," and another March 26, 2019 presentation targeted specifically to Oracle, Concentric continued to misrepresent the results of Cohort 1 of the Phase II TKA Trial.

78. In both presentations, Concentric falsely represented that ███████████████████████████████████████████████ This was not true. Concentric represented that its prior bunionectomy studies "achieved primary and all key secondary endpoints," defining the key primary endpoint as the AUC value at 0-96 hours and the first key secondary endpoint as the AUC value at 0-168 hours—███████████████████████████████████████

79. Concentric also reiterated that it ███████████████████████████ Beyond continuing to falsely represent that Concentric had ███████████████ what is notable about this representation is how it differs from Concentric's earlier slide

-13-

deck from January 2019.

80.   In the earlier slide deck, the p-value of ▮▮▮▮ was specifically referenced as being ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ By March 2019, however, Concentric deleted the metric with ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Either way, at the time Concentric presented this data to investors as statistically significant, Concentric knew that was false because ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

81.   Concentric also repeated its misrepresentation that the trial had shown a ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮

82.   **April 12, 2019**: Concentric presented its "Q1 2019 Company Update" to Plaintiffs and other potential investors, which ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ from Cohort 1 of the Phase II TKA Trial as had been included in its March presentation discussed above.

### D.   The May 13, 2019 Series B Preferred Stock Purchase Agreement ("SPA")

83.   On May 13, 2019, Plaintiffs and approximately 130 other investors entered into the Series B Preferred Stock Purchase Agreement ("SPA") with Concentric.[4]

84.   As part of the Series B financing, Concentric issued ▮▮▮▮▮▮▮▮▮ at a purchase price of ▮▮▮▮ per share (or an equivalent exchange for cancellation of indebtedness to other investors). Plaintiffs purchased 50.7% of those shares for a total of over $48 million.[5]

85.   As relevant here, in Section 3.27 of the SPA, Concentric represented and warranted:

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[4] Ex. A.
[5] *Id.*



86.     Section 3.33 of the SPA further represented and warranted:

87.     At no time prior to the May 13, 2019 execution date of the SPA did Defendants ever correct any of their misrepresentations detailed above regarding the "data and other results" of Cohort 1 of the Phase II TKA Trial that were made available to potential investors and upon which Plaintiffs relied in investing in Concentric.

**E.      Concentric's Disclosure of, and Shifting Explanations for, its Misrepresentations as to Cohort 1 of the Phase II TKA Trial**

88.     In what Defendants claim is a remarkable coincidence, the first time they purport to have realized that their repeated misrepresentations to Plaintiffs were erroneous was in June 2019—one month *after* they closed the Series B financing, which included the more than $48 million in investments from Plaintiffs. But Defendants' ever-shifting explanations for how they ended up reporting erroneous results to investors further belie the notion that their misrepresentations were unintentional.

89.     At the time Plaintiffs invested in Concentric, they had received data regarding only Cohort 1 of the Phase II TKA Trial, but two other cohorts of that trial (Cohorts 2 and 3) were ongoing. On June 10, 2019, Defendant Bellizzi emailed investors informing them that Concentric had just received Top Line Results ("TLRs") for *all* cohorts of the TKA trial. He informed investors that

90.     Defendant Bellizzi further wrote in that same email that these results were                          Concentric was still not telling investors that Cohort

-15-

COMPLAINT

1   1 of the TKA Trial ████████████████████████████████████████████

2   ██████████████████████████████████████████████████████

3   ████████████

4        91.   Just two days later, shortly after Concentric made the TLR results available to investors,

5   one of the principals for Oracle, Dr. Han Choi, wrote Dr. Bellizzi about the important representation

6   concerning the ████████████ of Cohort 1 of the TKA addressed above. Dr. Choi wrote: "Your slide

7   deck dated 4.12.2019 cites a p-value of ████ for C-008 on its ████████████ in Cohort 1 of the Phase

8   II TKA Trial. However, we were unable to find the analysis table that corresponds to this p-value for

9   Cohort 1."

10        92.   In other words, the first thing Plaintiff Oracle looked for upon being given access to the

11   underlying data from the TKA trials was support for the most important data point upon which it based

12   its investment in Concentric. And, when it could not find that support, it wrote the CEO for an explanation.

13        93.   In response, on June 13, 2019, Dr. Bellizzi for the first time acknowledged that the ████

14   ████████████████████████████████████████ He still did not acknowledge at this

15   time that Cohort 1 had ████████████████████████ He did, however, ████████████

16   ███████████████████████████████████████████████████

17   ███████████████████████████████████████████████████

18   ███████████████████████████████████████████████████

19   ████████████████████████

20        94.   Dr. Bellizzi was telling Plaintiff Oracle—Concentric's largest investor—that ████████

21   ███████████████████████████████████████████████████

22   ███████████████████████████████████████████████████

23   ███████████████████████████████████████████████████

24   ███████████████████████████████████████████████████

25   ████████████

26        95.   But Dr. Bellizzi simply invented these two explanations for the discrepancy—████████

27   ████████████████████████████—in an effort to mollify Concentric's biggest investor. Neither

28   explanation was truthful.

96.     On June 27, 2019, Concentric held a Board meeting, which included representatives of Plaintiffs Oracle and Cowen, to address these issues and to report on its investigation that month of the purportedly "new" data it received as to Cohort 1 of the Phase II TKA Trial.

97.     First, Concentric revealed that its June investigation purportedly ███████████ ████████████████████████████████ Of course, this fact was not "identified" during the June investigation, but ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ███████████████████ But Concentric never told Plaintiffs this fact until a month *after* they invested more than $48 million in Concentric.

98.     ████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████

[6] Note that the actual slide presented these comparison slides horizontally, but they are presented here vertically for legibility.

-17-
COMPLAINT



99.     As the highlighting indicates, these two slides are materially different.  It is also notable that Defendants chose to compare ████████████████████████████████████████

1

2

3       100.    Concentric's corrected slide further conceded that the study

4

5   but was now revealing to investors, including Plaintiffs, for the first time—one month after it had secured

6   tens of millions of dollars of their money in May 2019.

7       101.    The  June  27,  2019  Board  presentation  also

8

9   •

10

11

12

13

14   •

15

16

17       102.    Concentric's pretextual reasons for misrepresenting the TKA trial results to investors over

18   a five-month period withers under close scrutiny.

19       103.    Even if accurate that

20

21   , it would not change the fact that Defendants knew they were misrepresenting these results to

22   Plaintiffs.

23       104.    Defendants have never provided an explanation for

24

25

26

27       105.    Even  assuming  that  Dr.  Shafer  mistakenly  believed  these  results  were

28   during the precise five-month period in which Concentric was presenting data to

1    potential investors and securing their Series B investments, Concentric cannot deny that ███

2    ████████████████████████████████████████████████████████████████████

3    ████████████████████████████████████████████████████████████████████

4    ██████████████████

5        106.    Second, regarding Lotus's Interim Analysis in the second bullet, ███████

6    ████████████████████████████████████████████████████████████████████

7    ████████████████████████████████████████████████████████████████████

8    ████████████████████████████████████████████████████████████████████

9    ██████████████████████████████████████████████████████

10       107.    ███████████████████████████████████████████████████

11   ████████████████████████████████████████████████████████████████████

12   ██████████████████████████████████████████

13       108.    Second, Concentric's misguided explanation completely ignores that Dr. Donovan, and

14   Concentric's Clinical Operations Director, Carol Hodge, ████████████████████████

15   ██████████████████████████████████████████████

16       109.    In its June 2019 presentation, Concentric continued to cover up certain of its

17   misrepresentations, telling Plaintiffs and other investors that it had ███████████████████

18   ██████████████████    But, as discussed above, ███████████████████████████

19   ██████████████████████████████    Thus, Concentric was again misleading

20   investors when it told them in June 2019 ████████████████████████████████████

21   ██████████████████

22       110.    At the next Board of Directors meeting on July 24, 2019, Concentric admitted that the

23   ████████████████████████████████████████████████████

24       111.    Finally, in a September 5, 2019 Board presentation, Concentric recapped findings from

25   Cohort 1 of the Phase II TKA Trial as showing ███████████████████████████████████

26   ████████████████████████████████████████████████████████████████████

27   ████████████████████████████████████████████████████████████████████

28   ████████████████████████████████████████████████████████████████████

*                 *                 *

## CLAIMS FOR RELIEF

### COUNT I

### Violation of Section 10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

112.    Plaintiffs repeat and re-allege the allegations contained above as if fully set forth herein.

113.    Plaintiffs bring Count I against Concentric and the Individual Defendants based upon Section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

114.    Under Section 10(b) of the 1934 Act, it is unlawful any person to use or employ any "manipulative or deceptive device" in connection with the sale of any security. 15 U.S.C. § 78j(b). Rule 10b-5, in turn, makes it unlawful for any person, engaged in interstate commerce, to: (i) employ any scheme to defraud; (ii) make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engage in any act which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b-5.

115.    To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege: (i) a misrepresentation or omission; (ii) of material fact; (iii) made with scienter; (iv) on which the plaintiff justifiably relied; (v) that proximately caused the alleged loss.

116.    For a statement or omission to be misleading, it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists. To fulfill the materiality requirement, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.

117.    As set forth above, Concentric and the Individual Defendants, individually and in concert,

deceived and manipulated the Plaintiffs.  Between January and April 2019, Concentric, Dr. Bellizzi, and Dr. Donovan made numerous representations to Plaintiffs (before they made their Series B investments in May 2019) that misrepresented and obscured the results of the CA-008 clinical trials and ██████████ ████████████████████████████  Defendants also deceptively presented other facts, and omitted critical information from presentations to investors, to hide the significance of those results.

118.    Between March 2019 and April 2019, representatives of Oracle reviewed Concentric's January 17, 2019 slide deck titled "CA-008: TKA SAD Cohort #1; Preliminary Results" during a meeting with Dr. Bellizzi, the "March 2019" slide deck, the March 26, 2019 presentation (which Dr. Bellizzi delivered to Oracle in person on that date), and Concentric's Q1 2019 presentation on April 12, 2019. Defendants' false representations concerning Cohort 1 of the Phase II TKA Trials were the key commercial drivers influencing Oracle's decision to invest in Concentric.

119.    Between January 2019 and April 2019, representatives of Cowen reviewed Concentric's January 17, 2019 slide deck titled "CA-008: TKA SAD Cohort #1; Preliminary Results," the March 26, 2019 slide deck, and Concentric's Q1 2019 presentation dated April 12, 2019, which they received via email from Dr. Bellizzi on April 15, 2019.  Defendants' false representations concerning Cohort 1 of the Phase II TKA Trials were the key commercial drivers influencing the Cowen Plaintiffs' decision to invest in Concentric.

120.    Between January 2019 and April 2019, representatives of Venrock reviewed Concentric's January 17, 2019 slide deck titled "CA-008: TKA SAD Cohort #1; Preliminary Results," its "March 2019" slide deck. Defendants' false representations concerning Cohort 1 of the Phase II TKA Trials were the key commercial drivers influencing Venrock's decision to invest in Concentric.

121.    Between January 2019 and April 2019, Jay Kern of Kern Odysseus reviewed Concentric's January 17, 2019 slide deck titled "CA-008: TKA SAD Cohort #1; Preliminary Results," its "March 2019" slide deck, and its Q1 2019 presentation dated April 12, 2019, which it received via email from Dr. Bellizzi on April 15, 2019.  Defendants' false representations concerning Cohort 1 of the Phase II TKA Trials were the key commercial driver influencing Kern Odysseus's decision to invest in Concentric.  In fact, Jay Kern, one of the principals of Kern Odysseus, had invested personal funds in Concentric during an earlier bridge round of investments.  He did not invest funds of Kern Odysseus, which involved additional

investors, at that time, because he believed the investment was too risky and Concentric too unproven to do so at the time.  It was solely because of the false data that Defendants attributed to Cohort 1 of the Phase II TKA Trials (with the ███████████████████████ p-value) that Jay Kern decided to invest in the Series B shares on behalf of Kern Odysseus at Concentric's May 2019 valuation.

122.    Between January and April 2019, Paul Clark, trustee of PNC Trust, reviewed Concentric's "Q1 2019 Company Update" dated April 12, 2019, which prompted a telephone call with Dr. Bellizzi on April 29. On that phone call, Dr. Bellizzi reviewed the April 12 slide deck he had sent to PNC Trust.  Dr. Bellizzi confirmed falsely that CA-008 had achieved ███████████████████████ PNC Trust invested in Concentric based on the deceitful, fraudulent information that Defendants provided regarding the efficacy of CA-008.

123.    Between January 2019 and April 2019, Jack Schuler, majority partner in Schuler Concentric Partnership, reviewed Concentric's "Q1 2019 Company Update" dated April 12, 2019. Defendants' false representations concerning Cohort 1 of the Phase II TKA Trial in that presentation were the key commercial drivers influencing Schuler Concentric Partnership's decision to invest in Concentric.

124.    Thus, by May 2019, Defendants' external representations did not just create the false impression among Plaintiffs, but expressly told them—contrary to the true facts—█████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████

125.    After the closing of the Series B financing, each Plaintiff continued to receive deceptive communications from Defendants, including the email on June 10, 2019 where Dr. Bellizzi told investors that ████████████████████████████████████████ for the TKA study, and that these results were ████████████████████████████████████████ without revealing the truth that cohort 1 of the TKA study had ████████████████████████

126.    After Defendants' misrepresentations came to light in June 2019, Defendants made *additional* false statements between July and September 2019 to cover up the true reasons for its earlier misconduct.  As discussed above, Board presentations in July and September 2019 confirm that

Defendants made false statements about Cohort 1 of the Phase II TKA Trials.

127.   Defendants' misrepresentations were material as to all Plaintiffs because the revelation that the clinical trials of CA-008 showed ███████████████████████████████████ Trial significantly altered the total mix of information available to Plaintiffs.  Plaintiffs were investing in Concentric almost exclusively on the prospects for the approval and marketability of CA-008.  The most important data informing those prospects were the falsely reported results from Cohort 1 of the Phase II TKA Trial.  After all, Concentric already had revealed that clinical trials revealed ███████████ ████████████████████████████████████████████████ If Defendants accurately represented the ██████████ for Cohort 1 of the Phase II TKA Trial—the surgical procedure that Concentric itself told investors had the █████ ████████████████—neither Plaintiffs nor any reasonable investor would have invested in Concentric at anything approaching the valuation of the company at that time.

128.   Defendants acted with scienter because they knew that all statements described herein concerning CA-008 were false.  At a minimum, Defendants were reckless as to the truth or falsity of those statements.

129.   Among other facts set forth above: (1) just days after receiving the Interim Data from Cohort 1 of the Phase II TKA Trial, Concentric's Chief Medical Officer and biostatistician (Dr. Shafer) recognized—and wrote in emails to Dr. Bellizzi and Dr. Donovan—████████████████████████ ████████████████ (2) Lotus delivered results on December 31, 2018, showing that both █████████ ████████████████████ (3) Dr. Royal, Concentric's CMO, accessed those results at least by mid-February 2019, just days before the Company informed the FDA in a formal written submission that the █████████████████████████████████████████████████████ ████████████████ and (4) in all presentations through the May 2019 closing of the Series B financing, Defendants continued to inform Plaintiffs that the trial had ████████████████, correcting those misrepresentations only after the Series B investment closed.

130.   Defendants misrepresented these facts to Plaintiffs in order to entice them to invest in the Series B offering.  And their baseless explanations to Plaintiffs and other investor for those misrepresentations, once discovered, were intended to disguise their deceptive conduct.

131.    None of the Plaintiffs would have invested in the Series B offering at Concentric's May 2019 valuation in the absence of Defendants' misrepresentations and omissions, which they relied upon before the close of the Series B fundraising.  Importantly, Defendants were in exclusive possession of the key data for Cohort 1 of the Phase II TKA Trial, and thus the Plaintiffs' reliance on Concentric's official presentations and other communications regarding the results of CA-008 testing was justified.

132.    Plaintiffs suffered damages as a direct and proximate result of Defendants' misconduct. Because none of the Plaintiffs would have invested in the Series B shares of Concentric at their May 2019 price had they known the truth about Cohort 1 of the Phase II TKA Trial, Plaintiffs were harmed at least by the amount that they overpaid for their individual investments in Concentric.

133.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of Defendants' false statements and misrepresentations concerning CA-008. The statements alleged herein all relate to then-existing facts and conditions concerning the negative outcome of Cohort 1 of the Phase II TKA Trial, which were known to Defendants but not to Plaintiffs.

134.    By virtue of the foregoing, Concentric and the Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### Violation of Section 20(a) of The Exchange Act
### Against The Individual Defendants Bellizzi and Donovan

135.    Plaintiffs repeat and re-allege the allegations contained above as if fully set forth herein.

136.    Plaintiffs bring Count II against Individual Defendants, Dr. Bellizzi and Dr. Donovan, based upon Section 20(a) of the 1934 Act, 15 U.S.C. § 78t(a).

137.    Section 20(a) provides that a person who "controls" any person liable under the securities laws is jointly and severally liable for the violation "unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a).

138.    To claim control person liability under Section 20(a), Plaintiffs must demonstrate a primary violation of federal securities law—here a violation of Section 10(b) and Rule 10b-5—and that the

Individual Defendants exercised actual power or control over the primary violator. For a Section 20(a) claim based on an underlying violation of Section 10(b), the pleading requirements for both violations are the same. As set forth above, Concentric and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions alleged in this Complaint.

139.   By virtue of their high-ranking positions within Concentric—Dr. Bellizzi as CEO and Dr. Donovan as President and Chief Scientific Officer—the Individual Defendants are also liable pursuant to Section 20(a). They both controlled the operation and management of Concentric, and conducted and participated (directly and indirectly) in all of Concentric's outward representations to investors. Because of their senior positions, the Individual Defendants were privy to the negative data concerning Cohort 1 of the Phase II TKA Trial, and chose to keep that information secret.

140.   For example, as early as December 2018, Drs. Bellizzi and Donovan were informed that the Interim Data showed ███████████████████████████████████ ████████████████████████████ Yet Dr. Donovan participated in Concentric's presentations to potential investors, including Plaintiffs, and—on information and belief—directed or participated in the creation of aspects of those presentations ██████████████████████████████████████, when he knew that it was not.

141.   For his part, Dr. Bellizzi held numerous meetings and calls with Plaintiffs as identified above, made presentations and circulated emails to all of Concentric's investors between both before and after Concentric closed its Series B financing to cover up the truth about Cohort 1 of the Phase II TKA Trial. What Bellizzi presented to Plaintiffs and other investors as a resounding success, was, in fact, a failure. Dr. Bellizzi knowingly deceived Plaintiffs into investing more than $48 million based on his repeated false representations. His conduct directly contributed to a deceptive scheme against Plaintiffs.

142.   Because of their positions of control and authority within Concentric, Drs. Bellizzi and Donovan were able to—and did—control the contents of every deceptive communication with Plaintiffs. Drs. Bellizzi and Donovan abused their positions of authority at Concentric to orchestrate unlawful artifices to deceive Plaintiffs and grab investments, and such violations of § 10(b) and Rule 10b–5 make the Individual Defendants secondarily liable under Section 20(a).

## COUNT III

### Violation of Cal. Corp. Code Secs. 25401, 25501
### Against Defendant Concentric

143. Plaintiffs repeat and re-allege the allegations contained above as if fully set forth herein.

144. Plaintiffs bring Count III against Concentric based upon Cal. Corp. Code §§ 25401 and 25501.

145. Delaware law applies here as the Parties agreed in Section 7.3 of the SPA that the Series B Agreement would be governed "in all respects by the internal laws of the State of Delaware as applied to agreements entered into among Delaware residents to be performed entirely within Delaware, without regard to principles of conflicts of law." Under Delaware law, the securities transactions alleged herein—which occurred principally in California—are still actionable under the California securities laws.

146. Under Cal. Corp. Code § 25401, "[i]t is unlawful for any person to offer or sell a security in this state . . . by means of any written or oral communication that includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which [the statements] were made, not misleading."

147. Under Cal. Corp. Code § 25501, those who suffer injury due to a violation of section 25401 are entitled to monetary damages or rescission.

148. To state a claim under section 25401, a plaintiff need only show that there was a sale or purchase in California by fraudulent or untrue statements section 25401or by omitting material facts that would by omission make the statements misleading. Liability extends to the actual seller in privity with the purchaser. Proof of scienter is not required to state a claim under section 25401, nor is proof of reliance or causation.

149. As discussed in great detail above, Concentric made numerous false representations of material fact to Plaintiffs between January 2019 and September 2019, which were material to Plaintiffs' investment decisions, induced all of them to purchase Series B shares in Concentric, were made for the purpose of deceiving Plaintiffs and obtaining money, and proximately caused monetary damages to Plaintiffs in the form of lost investment or overpayment for Plaintiffs' Series B shares. Thus, for all of the reasons explaining how Concentric violated Section 10(b) and Rule 10b-5, it also liable under Cal.

Corp. Code §§ 25401 and 25501.

150.    Plaintiffs are in contractual privity with Concentric as the Parties executed the SPA on May 13, 2019 in which Plaintiffs purchased Series B shares in Concentric.  These transactions were executed from or within California, and the SPA was substantially performed in California.  In addition, a substantial portion of Concentric's misrepresentations between January 2019 and September occurred in or were directed from California.

151.    Because Concentric is liable under section 25401, Plaintiffs are entitled to damages or rescission of the SPA pursuant to section 25501.

**COUNT IV**

**Violation of Cal. Corp. Code Secs. 25504, 25504.1**
**Against The Individual Defendants**

152.    Plaintiffs repeat and re-allege the allegations contained above as if fully set forth herein.

153.    Plaintiffs bring Count IV against Individual Defendants, Dr. Bellizzi and Dr. Donovan, based upon Cal. Corp. Code §§ 25504 and 25504.1.

154.    Delaware law applies here as the Parties agree in Section 7.3 of the SPA that the Series B Agreement would be governed "in all respects by the internal laws of the State of Delaware as applied to agreements entered into among Delaware residents to be performed entirely within Delaware, without regard to principles of conflicts of law."  Under Delaware law, the securities transactions alleged herein— which occurred principally in California—are still actionable under California securities laws.

155.    Under Cal. Corp. Code § 25504, "[e]very person who directly or indirectly controls a person liable under Section 25501 . . . every partner in a firm so liable, every principal executive officer or director of a corporation so liable, every person occupying a similar status or performing similar functions . . . who materially aids in the act or transaction constituting the violation . . . are also liable jointly and severally with and to the same extent as such person, unless the other person who is so liable had no knowledge of or reasonable grounds to believe in the existence of the facts by reason of which the liability is alleged to exist."  There is no privity requirement as between Plaintiffs and Individual Defendants under section 25504.

156.    To claim control person liability under section 25504, Plaintiffs must first establish a

primary violation of California securities law—here Concentric's violation of Cal. Corp. Code §§ 25401 and 25501.  As set forth above, Concentric violated sections 25401 and 25501 by their acts and omissions alleged in this Complaint.

157.    Plaintiffs also must show that Individual Defendants exercised positions of control, such as "principal executive officer" or positions "occupying a similar status or performing similar functions." At all relevant times herein, Dr. Bellizzi has served as Concentric's CEO and Dr. Donovan has served as Concentric's President and Chief Scientific Officer.  They both controlled the operation and management of Concentric, and conducted and participated (directly and indirectly) in all of Concentric's outward representations to investors.  And because of their senior positions, the Individual Defendants were privy ████████████████████████████████████████████████

158.    In addition, Plaintiffs must show that the Individual Defendants knew of the false or misleading representations and materially aided in Concentric's violations by playing a direct role in the deception.  As discussed in great detail above, both Individual Defendants had intimate knowledge of Cohort 1 of the Phase II TKA Trial in December 2018 and beyond, but misrepresented that information to Plaintiffs until after the Series B round of fundraising had closed.

159.    Dr. Donovan wanted to entice investors and his conduct directly contributed to Concentric's deceptive scheme against Plaintiffs.

160.    Dr. Bellizzi delivered presentations and held numerous meetings with Plaintiffs, and circulated emails to all Plaintiffs between January 2019 and June 2019 (before and after Series B financing) to cover up the truth about Cohort 1 of the Phase II TKA Trial.

161.    What the Individual Defendants presented to Plaintiffs as a resounding success was, in fact, a failure.  The Individual Defendants were instrumental in making sure that Plaintiffs did not discover the truth about the CA-008 trials until after they had invested more than $48 million in the company. And they continued deceiving Plaintiffs even after they made their investments to keep them from learning that their misrepresentations were knowing and intentional.

162.    Secondary liability is also created under Cal. Corp. Code § 25504.1, which provides in pertinent part that "[a]ny person who materially assists in any violation of Section . . . 25401 . . . with intent to deceive or defraud, is jointly and severally liable with any other person liable under this chapter

for such violation." There is no privity requirement as between Plaintiffs and Individual Defendants under section 25504.1.

163.    Section 25504.1 makes any person jointly and severally liable for a primary violation of California securities law—here Concentric's violation of Cal. Corp. Code §§ 25401 and 25501—if that person materially assists in the violation with the intent to deceive or defraud.  Defendants do not need to exercise positions of control over the primary violator in order to be liable under section 25504.1.

164.    The Individual Defendants materially assisted in the deception against Plaintiffs because, as discussed above, they manipulated the ████████████████████████████████ and kept that information hidden from investors to ensure successful Series B fundraising by ████████ ████████████████████████.

165.    The Individual Defendants were instrumental in making sure that Plaintiffs did not discover the truth about Cohort 1 of the Phase II TKA Trial before closing the Series B round of financing, because they controlled the dissemination of the trial data that Lotus compiled, delivered multiple PowerPoint presentations with false data, and held numerous meetings and telephone calls falsely touting the success that trial.

166.    There can be little dispute that the Individual Defendants acted with the requisite intent to deceive.  Among other facts set forth above: (1) days after receiving the Interim Data from Cohort 1 of the Phase II TKA Trial, Concentric's CMO and biostatistician recognized—and wrote in emails to Dr. Bellizzi and Dr. Donovan—████████████████████████████████ (2) Lotus delivered results on December 31, 2018, showing ████████████████████████████████ (3) Concentric's CMO accessed those results at least by mid-February 2019, within days of the Company informing the FDA in a formal written submission ████████████████████████████ ████████████████████████████ and (4) in all presentations through the May 2019 closing of the Series B financing, the Individual Defendants continued to inform potential investors that ████████████████████████████

167.    The Individual Defendants' deception regarding success in a trial involving an important surgical procedure was specifically designed to woo investors for the Series B offering.

168.    Because of their roles in orchestrating the fraud and deception against Plaintiffs, the

-30-

Individual Defendants are liable under sections 25504 and 25504.1.

## COUNT V

### Fraud
### <u>Against All Defendants</u>

169.    Plaintiffs repeat and re-allege the allegations contained above as if fully set forth herein.

170.    Delaware law applies here as the Parties agree in Section 7.3 of the SPA that the Series B Agreement would be governed "in all respects by the internal laws of the State of Delaware as applied to agreements entered into among Delaware residents to be performed entirely within Delaware, without regard to principles of conflicts of law."

171.    Under Delaware law, fraud or deceit consists of a false representation made by the defendant, knowledge or belief that the representation was false (or was made with reckless indifference to the truth), an intent to induce the plaintiff to act or to refrain from acting, the plaintiff's action or inaction taken in justifiable reliance upon the representation, and damage to the plaintiff as a result of such reliance.

172.    Moreover, in order to state a claim against Defendants, Plaintiffs must allege that Defendants either represented false statements as true, actively concealed facts which prevented Plaintiffs from discovering them, or remained silent in the face of a duty to speak.

173.    As set forth above, Defendants made numerous false representations of material fact to Plaintiffs between January 2019 and September 2019, which were material to Plaintiffs' investment decisions, induced all of them to purchase Series B shares in Concentric, were made for the purpose of deceiving Plaintiffs and obtaining money, and proximately caused monetary damages to plaintiff in the form of lost investment or overpayment for Plaintiffs' Series B shares.  Thus, for all of the reasons set forth above explaining how Defendants violated Section 10(b) and Rule 10b-5, they are also liable for common law fraud.

174.    When Defendants made their false representations, they knew them to be false, or at the very least, acted with reckless indifference as to the truth of those representations.

175.    Defendants' intent in making those false representations was to induce Plaintiffs and other potential investors to invest tens of millions of dollars in Concentric's Series B stock offering.

176.    Plaintiffs justifiably relied on Defendants' misrepresentations of the results of Cohort 1 of

the Phase II TKA Trial and their omissions and and deceptive presentations of other facts, because Defendants were in sole possession of the raw data.

177.    Defendants' misrepresentations and omissions were material in that they misrepresented that ██████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████ Defendants also omitted and deceptively presented other information in its presentations to Plaintiffs, such as the data regarding the ██████████, that they had a duty to disclose in order to prevent statements it actually made from being misleading.

178.    Plaintiffs were directly and proximately damaged as a result, in that they would not have invested in Concentric's Series B shares at their price in May 2019 in the absence of Defendants' misrepresentations and omissions.

## COUNT VI

### Equitable Fraud
### Against All Defendants

179.    Plaintiffs repeat and re-allege the allegations contained above as if fully set forth herein.

180.    To state a claim for equitable fraud under Delaware law, a plaintiff must satisfy all the elements of common-law fraud with the exception that a plaintiff need not demonstrate that the misstatement or omission was made knowingly or recklessly.  Thus, for all of the reasons Defendants are liable under Section 10(b) and Rule 10b-5 or common law fraud, they are also liable for equitable fraud under Delaware law.

181.    The doctrine of equitable fraud provides a remedy for negligent or innocent misrepresentations.  Here, while Defendants' misrepresentations and omissions, as outlined above, were both knowing and intentional, they *eventually* admitted the misrepresentations to Plaintiffs.  As such, even if Defendants somehow counterfactually contend that their misrepresentations were neither knowing nor intentional, they have no defense to those misrepresentations being *at least* negligent or innocent.

182.    Plaintiffs are entitled to equitable relief as a result of Defendants' misrepresentations, including rescission or reformation of the SPA.

## COUNT VII

### Breach of Contract
### Against Defendant Concentric

183.   Plaintiffs repeat and re-allege the allegations contained above as if fully set forth herein.

184.   To state a claim for breach of contract under Delaware law, Plaintiffs must show that they had a valid contract, that Concentric breached its representations in, and obligations imposed by, that contract, and that damages resulted from the breach.

185.   On May 13, 2019, Concentric entered the SPA with each of the Plaintiffs.  The SPA was and is a valid agreement imposing obligations on all parties thereto.  Plaintiffs have complied with all of their obligations under the SPA. All parties also made a series of representations in the SPA.

186.   

187.   Between January 2019 and May 2019 Concentric described the results of Cohort 1 of the Phase II TKA Trial to investors in a way that was both inaccurate and incomplete and presented data from that trial that was inaccurate and incomplete.  As early as December 2018, Concentric and its officers also

Concentric's willful dissemination of inaccurate information breached the clear proscriptions of Sec. 3.27.

188.

---

[7] "Investors" is defined as "persons and entities . . . listed on the Schedule of Investors attached as Exhibit A" to the Series B SPA. Ex. A at 1. Each of the Plaintiffs is an Investor as each Plaintiff is included in the "Schedule of Investors" at Exhibit A therein. *Id.*
[8] *Id.*

1

2

3

4

5      189.    However, Concentric's trial data were not prepared in accordance with applicable laws and

6 regulations, including the requirements of the FDA for sponsors under 21 C.F.R. Part 312, such as the

7 requirement for sponsors to monitor clinical investigation and to ensure the clinical investigation is

8 conducted in accordance with its investigational plan.  Concentric also failed to observe Good Clinical

9 Practice, a "standard for the design, conduct, performance, monitoring, auditing, recording, analyses, and

10 reporting of clinical trials that provides assurance that the data and reported results are credible and

11 accurate," in its preparation of data that it made available to Investors (including Plaintiffs).

12      190.

13

14

15      191.    This representation was also false.  Concentric did not provide Plaintiffs with the

16 , which would have shown

17 the falsity and inaccuracy of Concentric's representations regarding the

18 from Cohort 1 of the Phase II TKA Trial.

19      192.

20

21

22

23 For the same reasons

24 as above, this representation was false.

25      193.    By breaching its obligations and representations under these provision of the SPA,

26 Concentric denied Plaintiffs accurate information upon which to base their investment decisions, and

27 [9] *Id.*

28 [10] *Id.*
[11] *Id.*

-34-
COMPLAINT

instead provided them with wrong information and omitted critical facts.

194.    As a result of these breaches, Plaintiffs invested more than $48 million in Concentric, which they either would not have invested in May 2019, or would not have invested at the company's inflated May 2019 valuation, had Concentric presented complete and accurate facts to all its investors.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

(a) Compensatory damages in favor of Plaintiffs against Defendant Concentric for all damages sustained as a result of Concentric's wrongdoing, in an amount to be proven at trial, including interest thereon,

(b) Punitive damages for Plaintiffs' pendent state law claim for fraud against all Defendants (Count V),

(c) Legal rescission of the SPA or, in the alternative, reformation of the SPA to adjust each Plaintiff's equity stake in Concentric reflecting the corrected value of its original investment;

(d) Reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees, authorized pursuant to Section 7.16 of the SPA; and

(e) Such other and further relief as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury on all issues herein that are so triable.

Dated:  June 8, 2020                    SIDLEY AUSTIN LLP

                                        By:    /s/ Jaime A. Bartlett

                                               Jaime A. Bartlett (SBN 251825)
                                               jbartlett@sidley.com
                                               SIDLEY AUSTIN LLP
                                               555 California St., Suite 2000
                                               San Francisco, CA 94104
                                               Telephone: 415.772.1200

                                               Thomas K. Cauley, Jr.*
                                               tcauley@sidley.com
                                               Charles K. Schafer*

cschafer@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
Telephone: 312.853.7000

*pro hac vice applications pending*

*Attorneys for Plaintiffs*

COMPLAINT