UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ORACLE PARTNERS, L.P., et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>CONCENTRIC ANALGESICS, INC., et al.,<br><br>    Defendants. | Case No. 20-cv-03775-HSG<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS**<br><br>Re: Dkt. No. 70 |

Pending before the Court is the motion to dismiss filed by John Donovan, Frank J. Bellizzi, Jr. (collectively, "Individual Defendants"), and Concentric Analgesics, Inc. ("Concentric"). Dkt. Nos. 70 ("Mot."), 42 ("Opp."), 51 ("Reply"). For the following reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion to dismiss **WITH LEAVE TO AMEND**.

## I. BACKGROUND

Concentric is a clinical-stage biopharmaceutical company "developing pain-relieving products, primarily for post-surgical uses, that are injected at the surgical site to provide long-lasting pain relief." Compl. ¶¶ 19–20. Concentric's "flagship pain product" is called "CA-008." *Id.* at ¶ 21. "Concentric's management team includes its Founder & President, Dr. John Donovan, and its CEO, Dr. Frank Bellizzi."[1] *Id.* at ¶ 22.

Between 2017 and 2018, Concentric ran clinical trials of CA-008 across three surgical models, including bunionectomies, abdominoplasties, and total knee arthroplasties ("TKA"). *Id.* at ¶¶ 25–28. Concentric told potential investors that TKA surgeries held the "highest" commercial

---

[1] The complaint details on information and belief that Defendant Donovan "worked for a company that was working on developing a drug similar to CA-008," and that Defendant Bellizzi "is a dentist by training who was brought in by Dr. Donovan—a friend from college—to help lead Concentric, and Dr. Bellizzi does not have any prior experience developing analgesics." Compl. ¶¶ 23–24.

1   potential in terms of profitability. *Id.* at ¶¶ 27, 44. "CA-008 had shown early promise in

2   bunionectomies, a surgical model with little to no market, yet failed to yield any success in the

3   abdominoplasty surgical trial, which represented a medium sized market for the product." *Id.* at ¶

4   44. Plaintiffs allege that "present[ing] negative results from the TKA trial" would have made it

5   "extremely difficult for Concentric to raise money from potential investors" and "the market value

6   of Concentric's shares would have plummeted given CA-008's greatly reduced prospects for

7   success." *Id.* at ¶ 45.

8         Lotus, a clinical research organization hired by Concentric, conducted the TKA trial

9   between November and December 2018 for Cohort 1. *Id.* at ¶¶ 42, 46–47. On December 22,

10  2018, Lotus sent a link to "Interim Data" from the TKA Trial "by email to Carole Hodge,

11  Concentric's Clinical Operations copying Concentric's President, [Defendant] Donovan, and its

12  Chief Medical Officer ('CMO'), Dr. Michael Royal." *Id.* at ¶ 47. Lotus informed them that it

13  would provide its interim analysis of the data within a week. *Id.* In the meantime, Dr. Steve

14  Shafer, Concentric's biostatistician consultant, analyzed the Interim Data, and on December 28,

15  2018, "he wrote to the Individual Defendants and Royal: 'Neither the AUC results nor the opioid

16  use results are statistically significant between the groups in the absence of imputation.' " *Id.* at ¶

17  48. "Dr. Shafer then wrote that he used two different methods to impute the missing data 'and the

18  results weren't pretty.' " *Id.* at ¶ 51. "Dr. Royal, responded to Dr. Shafer that same day: 'I am not

19  surprised that the key results are not statistically significant; we knew this would happen going in

20  with the small sample size.' " *Id.* at ¶ 52. When Dr. Shafer replied agreeing "completely" with

21  Dr. Royal's view, he also told them about other methods of presenting the AUC data to investors,

22  but warned that investors may recognize the use of "an unfamiliar statistical test" and that another

23  technique may "scare investors." *Id.* at ¶¶ 55–56. Plaintiffs allege that Concentric instead opted

24  to "falsely represent[] . . . that the trial had been successful in meeting its goals by both

25  misrepresenting and obscuring the negative results." *Id.* at ¶ 60.

26        On December 31, 2018, Lotus emailed the link for its Interim Analysis to Defendant

27  Donovan, Dr. Royal, and Hodge. *Id.* at ¶ 61. The Interim Analysis concluded that the TKA

28  Trial's "primary endpoint, measuring average NRS pain scores at the 96 hour mark," had a p-

value of 0.4871," which is "nowhere near demonstrating efficacy with statistical significance."[2] *Id.* at ¶¶ 61–64. On January 2, 2019, Defendant Donovan asked Dr. Royal for assistance "putting [together] a couple of slides . . . to entice" a potential investor, by showing "that the first cohort *suggests* that we have *a shot* at succeeding in TKA." *Id.* at ¶ 66 (emphasis in original). On January 17, 2019, "Concentric put together a presentation for potential investors, including Plaintiffs, entitled 'CA-008: TKA SAD Cohort #1; Preliminary Results.' " The presentation "represent[ed] that Concentric had achieved both its primary and secondary endpoints . . . at high levels of statistical significance." *Id.* at ¶¶ 68–70. On February 15, 2019, "Concentric presented a 107-page 'Clinical Overview' to the FDA regarding CA-008" stating that as to Cohort 1 of the TKA trial, "neither" the primary endpoint nor the AUC secondary endpoint was "statistically significant for CA-008 vs. placebo." *Id.* at ¶ 72 (emphasis omitted).

Between January and May 2019, Defendants "expressly told" Plaintiffs "contrary to the true facts . . . that Cohort 1 of the Phase II TKA Trial had successfully achieved its primary and key secondary efficacy endpoints, and that the trial demonstrated that CA-008 reduced pain and opioid dependency to a statistically significant degree in a surgical model that Concentric represented had the highest commercial value for CA-008." *Id.* at ¶ 124. On May 13, 2019, Plaintiffs entered into the Series B Preferred Stock Purchase Agreement ("SPA") with Concentric and purchased 50.7% of shares issued at a purchase price of $7.6296 per share. *Id.* at ¶¶ 83–84.

Defendants concede that the statements that CA-008 had achieved two of the study's efficacy endpoints in Cohort 1 with statistical significance were inaccurate. *See* Mot. at 1.

**II. LEGAL STANDARD**

Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A defendant may move to dismiss a complaint for failing to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). "Dismissal under Rule 12(b)(6) is

---

[2] For purposes of this motion, the parties agree that "statistical conclusions with p-values of 0.05 or less are deemed statistically significant and statistical conclusions with greater p-values are not statistically significant." *See* Mot. at 5 n.6 (citing Compl. ¶ 63 & n.3).

1 appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). To survive a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when a plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In reviewing the plausibility of a complaint, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Nonetheless, Courts do not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

### i. Heightened Pleading Standard

Section 10(b) of the Securities Exchange Act of 1934 provides that it is unlawful "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance . . . ." 15 U.S.C. § 78j(b). Under this section, the SEC promulgated Rule 10b–5, which makes it unlawful, among other things, "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b). To prevail on a claim for violations of either Section 10(b) or Rule 10b–5, a plaintiff must prove six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 157 (2008).

At the pleading stage, a complaint alleging claims under Section 10(b) and Rule 10b–5 must not only meet the requirements of Federal Rule of Civil Procedure 8, but also satisfy the

heightened pleading requirements of both Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012). Under Rule 9(b), claims alleging fraud are subject to a heightened pleading requirement, which requires that a party "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Additionally, all private securities fraud complaints are subject to the "more exacting pleading requirements" of the PSLRA, which require that the complaint plead with particularity both falsity and scienter. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009).

## III. DISCUSSION

### A. Request for Incorporation By Reference

Defendants request that the Court consider incorporated by reference Exhibits A-J to the Silva Declaration, including the December 28, 2018 email from Dr. Shafer, Dr. Royal's response to Dr. Shafer's email, a December 31, 2018 email from Lotus, Lotus's Interim Analysis, the January 2, 2019 email from Dr. Donovan, a series of investor presentations, and the June 27, 2019 presentation Concentric gave to its Board of Directors. Dkt. No. 39 at 1. Defendants contend that the investor presentations form the basis of Plaintiffs' claims, that the various emails support Plaintiffs' scienter allegations, and that the board presentation contains the relevant corrective disclosure. *Id.* at 3. Plaintiffs do not object to Defendants' request "to the extent permitted by law." Dkt. No. 43 at 2.

In *Khoja v. Orexigen Therapeutics*, the Ninth Circuit clarified the incorporation by reference doctrine. 899 F.3d 988 (9th Cir. 2018). The incorporation by reference doctrine is a judicially-created doctrine that allows a court to consider certain documents as though they were part of the complaint itself. *Id.* at 1002. This is to prevent plaintiffs from cherry-picking certain portions of documents that support their claims, while omitting portions that weaken their claims. *Id.* However, it is improper to consider documents "only to resolve factual disputes against the plaintiff's well-pled allegations in the complaint." *Id.* at 1014.

The Court **GRANTS** Defendants' request, but notes that it will not consider any arguments that seek to "resolve factual disputes against the plaintiff's well-pled allegations." *See id.* at 1014.

5

### B. Securities Claims

Defendants contend that Plaintiffs fail to sufficiently plead scienter, economic loss, and loss causation. *See generally* Mot. The Court agrees that Plaintiffs fail to adequately plead (1) scienter as to Defendant Bellizzi; and (2) economic loss. Plaintiffs' claim under Section 20(a) of the Securities Act is expressly premised on the Section 10(b) claims. Compl. ¶¶ 135–138. Because the Court finds that Plaintiffs' Section 10(b) claim fails, it must also dismiss the Section 20(a) control person liability claim. *See Zucco*, 552 F.3d at 990.

#### ii. Scienter

Under the PSLRA, whenever intent is an element of a claim, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). "The PSLRA's strong inference requirement has teeth," and "is an exacting pleading obligation." *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020) (internal quotation marks omitted) (citing *Zucco*, 552 F.3d at 990). "The inference of scienter must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. The required state of mind is one of at least "deliberate recklessness." *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999), *as amended* (Aug. 4, 1999). "[R]ecklessness only satisfies scienter under § 10(b) to the extent that it reflects some degree of intentional or conscious misconduct." *Id.* at 977.

##### a. Individual Defendants

Plaintiffs contend that the complaint raises a strong inference of scienter because Defendants had access to information that contradicted the challenged statements when they made them. Plaintiffs provide specific allegations as to the content of three sources of information: the December 28, 2018 emails and accompanying analysis; the Lotus Interim Analysis; and the February 2019 FDA submission. But even assuming that the Court were persuaded by Plaintiffs' access theory in this case, Plaintiffs fail to plead with particularity that both Individual Defendants had access to all three sources. The December 28, 2018 emails were sent to both Individual Defendants, *see* Compl. at ¶ 48, but the email with the link to Lotus's Interim Analysis was only sent to Defendant Donovan, *see id.* at ¶ 61. There is little to support Plaintiff's suggestion that

Defendant Bellizzi had access to Lotus's Interim Analysis or that either Individual Defendant had access to or reviewed the FDA submission. In all, the Court finds the evidence fails to raise a strong inference of scienter as to Defendant Bellizzi.[3]

But the Court finds Plaintiffs' allegations sufficient as to Defendant Donovan. Plaintiffs allege that Lotus sent Defendant Donovan the link to the Interim Data with a notification that Lotus would provide the Interim Analysis within a week, that the December 28, 2018 emails were sent to Defendant Donovan, and that Lotus later sent the Interim Analysis to Defendant Donovan. *Id.* at ¶ 47–48, 61. In contrast to the relatively sparse factual allegations concerning Defendant Bellizzi, these allegations plausibly suggest that Defendant Donovan was tracking the updates on the TKA Trial, or at the very least was considered privy to them by relevant personnel. Importantly, Plaintiffs allege that two days after receiving the Interim Analysis concluding there was a lack of statistical significance, Defendant Donovan asked for help to create a slide deck "to entice" a potential investor, by showing that the "that the first cohort *suggests* that we have *a shot* at succeeding in TKA." *Id.* at ¶ 66 (emphasis in original). The Court can reasonably infer that Defendant Donovan learned about the accurate results of the TKA Trial given his subsequent request following the delivery of the Interim Analysis. Accordingly, viewed holistically, the allegations plausibly suggest that Defendant Donovan learned specific information, namely the lack of statistical significance in the TKA Trial results, then made statements contradicted by that specific information. The Court thus **DENIES** Defendants' motion to dismiss Defendant Donovan on scienter grounds.

### b. Core Operations Theory

Defendants argue that Plaintiffs fail to show that the core operations theory applies. "The core operations theory of scienter relies on the principle that corporate officers have knowledge of

---

[3] That the December 28, 2018 emails containing Dr. Shafer's summary and analysis were available to Defendant Bellizzi does not change the Court's conclusion. Putting aside Defendants' contentions that Plaintiffs "distort" these emails and that there are no allegations of actual knowledge of the contents, the complaint itself details that Dr. Shafer relayed that he was considering alternative methods of analysis and that Lotus was set to deliver its Interim Analysis of the Interim Data by the end of the week. Accordingly, on the facts pled and considering competing inferences, the allegation that Defendant Bellizzi had access to these initial communications does not raise a strong inference of scienter.

7

the critical core operation of their companies." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014) (quoting *Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech.*, Inc., 856 F.3d 605 (9th Cir. 2017)). "Proof under this theory is not easy. A plaintiff must produce either specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations, such as data monitoring . . . or witness accounts demonstrating that executives had actual involvement in creating false reports." *Id.* A plaintiff may also meet the standard "[i]n rare circumstances where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 786 (9th Cir. 2008).

To support application of the theory, Plaintiffs contend that it is "absurd" to suggest that Individual Defendants (1) "were left in the dark about the Interim Analysis for CA-008 (the official analysis of Concentric's most important product) evaluating the most important metric" for "Concentric's most important clinical study," and (2) were without knowledge of the FDA submission. Opp. at 17. Neither of Plaintiffs' arguments meets the heavy burden of satisfying the rare-circumstance prong, particularly as to Defendant Bellizzi. Plaintiffs argue that the CA-008's performance in the TKA trial "was central to Defendants' efforts to raise money from potential investors to conduct more trials and maintain Concentric's business." Opp. at 17. But that the TKA Trial was "central" to fundraising efforts does not make it absurd to suggest that Defendant Bellizzi was not involved in the details of the Interim Analysis or the 107-page FDA submission regarding CA-008.

Plaintiffs' citation to *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982 (9th Cir. 2008), does not compel a different conclusion. In *Berson*, the defendants allegedly failed to accurately report certain "stop-work orders" received from its government clients. *Id.* at 984. The company "immediately cease[d] to earn money" when the government issued stop-work orders, and these orders typically "signal[ed] a heightened risk that the company never w[ould] earn the money." *Id.* As to the element of scienter, the plaintiffs made no specific allegations that the individually named officers actually knew about the orders. *Id.* at 987. But the Ninth Circuit inferred scienter

8

because it would be "absurd" for the individual defendants, who were "directly responsible for" the company's "day-to-day operations" to be unaware of the "stop-work orders that allegedly halted tens of millions of dollars of the company's work." *Id.* at 988–89. Here, there are no similar factual allegations of a shutdown or monetary loss, or other circumstances that would make it absurd to suggest that Defendants were without knowledge of the alleged facts. Plaintiffs fail to show the core operation theory applies.

Accordingly, the Court finds that Plaintiffs have adequately pled scienter as to Defendant Donovan, but not Defendant Bellizzi.[4] The Court thus **GRANTS** Defendants' motion to dismiss Defendant Bellizzi on scienter grounds.

### iii. Economic Loss

Defendants also argue that Plaintiffs fail to plead economic loss. Mot. at 22. Plaintiffs respond that they need only allege "a loss in the principal value of their Concentric shares as a result of the disclosure of the true results of the TKA Trial that Defendants had misrepresented." Opp. at 20. Plaintiffs cite to *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1199 (C.D. Cal. 2008), to argue that they need not allege "exact damages or the price dollar value of their declines." But notably, the court in *Countrywide* preceded its holding by stating that it was unclear whether "Rule 9(b)'s particularity requirement governs [economic] loss or loss causation." *Id.* Though it nonetheless held the plaintiffs pled their economic losses with particularity, *see id.*, it is now clear that "Rule 9(b) applies to all elements of a securities fraud action," *Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014); *see also Crago v. Charles Schwab & Co.*, No. 16-CV-03938-RS, 2017 WL 2540577, at *7 (N.D. Cal. June 12, 2017) (noting "plaintiffs have not identified any authorities supporting the notion that pleading a high likelihood of completely unspecified losses is sufficient to satisfy their duty to plead actual economic losses

---

[4] Defendants further contend that Plaintiffs advance an invalid "collective scienter" argument. Reply at 10. Despite Defendants' contentions to the contrary, the Ninth Circuit's holding in *Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424 (9th Cir. 1995), did not categorically reject the concept of collective scienter. *See Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 744 (9th Cir. 2008). Instead, the court of appeals has clarified that "*Nordstrom* does not foreclose the possibility that, in certain circumstances, some form of collective scienter pleading might be appropriate." *Id.* at 745. But the Court need not consider its application here, because Plaintiffs maintain that the collective scienter doctrine "has no bearing on" their allegations. Opp. at 16.

with particularity"). The Court agrees that exactitude is not required at this stage, and Defendants acknowledge that other factual allegations, such as a company's bankruptcy or a diminished subsequent valuation, could suffice. But Defendants maintain that none of Plaintiffs' allegations allow the Court to reasonably infer that the value of their shares actually changed. Reply at 13.

The Court recognizes that this case does not present the typical fraud-on-the-market scenario involving publicly listed securities. And there is relatively limited caselaw regarding the sufficiency of allegations as to the element of economic loss for shares of privately-held entities. But even absent a sale or other market event, Plaintiffs still must plead economic loss with particularity. The Court finds instructive the Ninth Circuit's recent decision in *Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*, --- F.3d ----, No. 19-16667, 2021 WL 1992242, at *9 (9th Cir. 2021), which addressed loss causation. In *Irving*, to allege economic loss, the plaintiff had pointed to a decline in Uber's valuation that "reduc[ed] the value of [its] . . . securities and their actual and anticipated investment returns by billions of dollars." *Id.* at *3. The Ninth Circuit did "not dispute" the allegation of an "apparent valuation decrease[]," but held that the plaintiff "fail[ed] to plead with particularity and distinguish among the various misstatements and revelations that allegedly caused that decrease." *Id.* at *8.

Significantly, however, the Ninth Circuit rejected the plaintiff's alternative theory that purported price inflation based on alleged misstatements was itself sufficient to establish economic loss. *See Irving*, 2021 WL 1992242 at *9 ("Irving identifies its alternative theory as 'the truism' that, under California law, losses may arise the moment investors purchase inflated securities. We have already rejected that contention."); *id.* at *6 (analyzing federal precedent as "unusually persuasive" in interpreting California securities law, and explaining that the framing of the fraud-on-the-market theory of loss causation set out in *In re Bofi Holding Inc. Sec. Litig.*, 977 F.3d 781, 789 (9th Cir. 2020), "notably conflicts with Irving's assertion that mere inflation is enough").[5]

---

[5] Plaintiffs assert, based on nearly twenty-year-old Second Circuit authority, that "plaintiffs *can* 'suffer[] a loss at the time of purchase [where] the value of the securities was less than that represented by defendants' which signals 'a disparity between the transaction price and the true 'investment quality' of the securities at the time of transaction.' " Opp. at 21 (quoting *Emergent*

10

The Ninth Circuit also rejected the plaintiff's contention that "a different analysis should apply because Uber's Offerings' shares were privately traded rather than publicly listed securities," holding that "the private nature of the transactions does not excuse [plaintiff] from pleading loss causation." *Id.* at *9. The court of appeals explained that "fundamentally the same loss causation analysis occurs," under which the plaintiff carries "the burden of showing 'the necessary link between the claimed misrepresentations and the economic loss [] suffered.' " *Id.* (citing *Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1116, 1123 (9th Cir. 2013)).

Though *Irving* addressed loss causation, the Court finds that its reasoning requires the Plaintiffs here to plausibly allege that they "suffered" an actual economic loss connected to the claimed misrepresentations, and that, notwithstanding "the private nature of the transactions," they are not excused from pleading the element with particularity. *See id.* at *9.

Though Plaintiffs assert that their losses did not arise solely from purchasing their shares at an inflated purchase price, *see* Opp. at 20, they advance no alternative measure of purported loss. Plaintiffs contend that as in *In re Daou Sys., Inc.*, 411 F.3d 1006, 1027 (9th Cir. 2005), their economic losses "do not arise solely" from purchasing shares at an inflated purchase price, but also result from the "decline in their stock value that was the direct result of [Defendants'] misrepresentations." Opp. at 20 (emphasis omitted). But the plaintiffs in *Daou* pled economic loss with sufficient particularity, alleging "a steep drop in Daou's stock price" to "$3.25 per share, a staggering 90% drop from the Class Period high of $34.375 and a $17 per share drop from early August 1998." *See* 411 F.3d at 1026–27. Here, in contending that they adequately allege "a loss in the principal value" of their shares, Plaintiffs point only to allegations that the valuation of Concentric's shares would have been lower at the time they made their investment if the truth had

---

*Capital Inv. Mgmt. LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 198 (2d Cir. 2003) (discussing *Suez Equity Invs., L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 98 (2d Cir. 2001)). But importantly, the Second Circuit clarified that it "did not mean to suggest in *Suez Equity* that a purchase-time loss allegation alone could satisfy the loss causation pleading requirement," and instead "emphasized that the plaintiffs had 'also adequately alleged a second, related, loss.' " *Emergent*, 343 F.3d at 198. And in any event, whatever the rule might be in the Second Circuit, in *Irving* the Ninth Circuit has now clearly rejected the principle advanced by plaintiffs.

been known.  *See* Opp. at 20 (citing Compl. ¶¶ 45, 127, 131–32, 178, 194); *see*, *e.g.*, Compl. ¶ 127 ("If Defendants accurately represented the negative results . . . neither Plaintiffs nor any reasonable investor would have invested in Concentric at anything approaching the valuation of the company at that time."); *id.* at ¶ 132 ("Because none of the Plaintiffs would have invested in the Series B shares of Concentric at their May 2019 price had they known the truth . . . Plaintiffs were harmed at least by the amount that they overpaid for their individual investments in Concentric.").  This amounts to a claim that the "loss" stems from share inflation due to the misrepresentations, but fails to explain how Plaintiffs *actually* suffered any loss.  Plaintiffs thus have not pled economic loss with sufficient particularity to plausibly establish the existence and magnitude of any claimed loss.

Accordingly, the Court finds that Plaintiffs fail to adequately plead economic loss, and **GRANTS** Defendants' motion to dismiss on this ground.[6]

### C. Equitable Fraud[7]

Defendants also argue that Plaintiffs fail to state an equitable fraud claim under Delaware law as a matter of law.  Mot. at 24–25.  "[E]quitable fraud does not require a showing of scienter, reflecting its willingness to provide a remedy for negligent or innocent misrepresentation." *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 144 (Del. Ch. 2009) (internal quotations and citation omitted).  "Equitable fraud is not available in every case or to every plaintiff.  It requires special equities, typically the existence of some form of fiduciary relationship, such as that between a director and stockholder or a trustee and cestui que trust, although other circumstances might be cited."  *Id.*  "These other circumstances include situations where equity affords its special remedies, e.g., rescission, or other equitable remedies are sought." *Eurofins Panlabs, Inc. v. Ricerca Biosciences, LLC*, No. CIV.A. 8431-VCN, 2014 WL 2457515, at *18 (Del. Ch. May 30, 2014) (citation omitted); *U.S. W., Inc. v. Time Warner Inc.*, No. CIV. A. 14555,

---

[6] Having found that Plaintiffs fail to plead economic loss, the Court need not yet consider the parties' arguments about loss causation.
[7] The Court does not address the remaining state law claims, *see* Compl. ¶¶ 143–78, 183–94, which Defendants only challenged for lack of original subject matter jurisdiction if the Court dismissed the federal claims.  *See* Mot. at 25; Opp. at 25.

12

1    1996 WL 307445, at *26 (Del. Ch. June 6, 1996).

Plaintiffs purport to ground their claim in the second theory because the complaint seeks equitable remedies of recission or contract reformation. Opp. at 24. But Defendants point to *LVI Grp. Invs., LLC v. NCM Grp. Holdings*, LLC, No. CV 12067-VCG, 2018 WL 1559936, at *18 n.243 (Del. Ch. Mar. 28, 2018), for the proposition that "equitable fraud cannot be asserted simply by alleging common law fraud minus scienter and tacking on a request for restitution." In *LVI*, the court found that the plaintiff had "failed to point to any 'special equities'" and rejected the plaintiff's attempt "to save its equitable fraud claim by pointing out that it is seeking restitution, an equitable remedy." *Id.* at 18. The court cited the reasoning of another case, explaining that "if equitable fraud claims that do not require the plaintiff to prove scienter can be brought against any defendant, regardless of the relationship between the parties, then there would be no reason to ever assert a fraud claim under the more rigorous common law standard." *Id.* at 18 n.243 (citing *Homan v. Turoczy*, 2005 WL 5756927, at *13 n.40 (Del. Ch. Aug. 12, 2005)). But in addressing the "less than clear" circumstances when a "plaintiff may press an equitable fraud claim in this court," the *Homan* court noted in dicta that "it would be a viable approach for Delaware to hold that equitable fraud can only be pled when a fiduciary or other relation exists between the plaintiff and defendant, or at most in the additional circumstance when the plaintiff is seeking actual rescission and avoidance of the underlying contract altogether." 2005 WL 5756927, at *13 n. 41.

Since then, the court has allowed such "add-on claim[s]" when plaintiffs have "pled a special circumstance" by seeking equitable remedies such as recission. *See*, *e.g.*, *Eurofins*, 2014 WL 2457515, at *18 & n.134. Following *Homan*, the *Eurofins* court similarly noted that the "law of equitable fraud is 'not as well defined as other areas of Delaware jurisprudence'" and that "[i]ts place in a commercial relationship negotiated by sophisticated parties should be limited." *Id.* (citing *Homan*, 2005 WL 5756927, at *13 n.40). It nonetheless found that the plaintiff's equitable fraud claims survived, despite being "duplicative" and arising "in the context of an arm's length transaction negotiated by sophisticated parties," because there was "some basis for fraudulent behavior." *Id.* The Court is thus not persuaded that Plaintiffs' equitable fraud claim fails as a matter of law at this stage on the basis that it is an "add-on claim." Accordingly, the Court

13

**DENIES** Defendants' motion to dismiss Plaintiffs' equitable fraud claim.

## IV. CONCLUSION

For the reasons explained above, the Court **GRANTS IN PART** Defendants' motion to dismiss **WITH LEAVE TO AMEND**, and otherwise **DENIES** the motion. Any amended complaint must be filed within twenty-eight (28) days of the date of this order.

When preparing an amended complaint, Plaintiffs are further ordered to prepare a statement-by-statement chart of the information required by 15 U.S.C. § 78u-4(b)(1) and (2) that specifically identifies: (A) each statement or action alleged to have been false or misleading, (B) the reasons the statement or action was false, misleading, or deceptive when made, and (C) if an allegation regarding the statement or omission is made on information and belief, all facts on which the belief is formed. The chart should clearly identify which statements or omissions are attributable to which defendants, and include a detailed statement of the facts giving rise to a strong inference that each defendant acted with the required state of mind. Plaintiffs should also summarize their allegations regarding what each defendant knew with regard to the statement or omission, and when they knew it. Such a chart should be included within any amended complaint or attached to any amended complaint. For guidance on the format for such a chart, the Court directs Plaintiffs to review *In re NVIDIA Corp. Sec. Litig.*, 18-cv-07669-HSG, Dkt. No. 149-2.

**IT IS SO ORDERED.**

Dated: 6/7/2021

HAYWOOD S. GILLIAM, JR.
United States District Judge